EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Janet Santana y otros<br><br>        Demandante<br><br><br>              v.<br><br><br>Gobernadora Sila María<br>Calderón y otros<br><br>        Demandada | Certiorari<br><br>2005 TSPR 86<br><br>164 DPR _____ |

Número del Caso: CT-2004-2

Fecha: 17 junio 2005

United States District Court

                District of Puerto Rico

Juez Ponente:

                Hon. Jaime Pieras, Jr.

Abogada de la Parte Demandante:

                Lcda. Monique Guillemard-Noble


Oficina del Procurador General:

                Lcda. Ana R. Garcés Camacho
                Procuradora General Auxiliar


Materia: Certificación Interjurisdiccional


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Janet Santana y otros

    Demandante

       v.

                        CT-2004-2

Gobernadora Sila María
Calderón y otros

    Demandada

Opinión del Tribunal emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 17 de junio 2005

La Corte de Distrito de los Estados Unidos para el Distrito de Puerto Rico acude ante nosotros mediante el procedimiento de certificación y nos formula la siguiente pregunta: ¿Si la Gobernadora del Estado Libre Asociado de Puerto Rico tiene la autoridad, bajo la Constitución de Puerto Rico, para destituir a la Directora Ejecutiva del Consejo de Desarrollo Ocupacional y Recursos Humanos? [1]

---

[1] El texto original de la pregunta certificada indica: "Does the Governor of Puerto Rico have the authority under the Constitution of Puerto Rico to remove the Executive Director of the HRODC?"

Previo a la discusión del asunto traído ante nuestra, debemos resumir los hechos del caso según los mismos nos fueron presentados por la Corte de Distrito en su solicitud de certificación y los documentos anejados en la misma.

I

A.

La señora Janet Santana comenzó en el servicio público del gobierno del Estado Libre Asociado en el año 1994 cuando comenzó a trabajar en el Departamento de Educación. Posteriormente pasó a laborar a la Oficina del Gobernador donde ejerció el cargo de Ayudante a cargo de Asuntos Federales. Allí laboró de enero de 1997 a julio de 2000, cuando fue nominada por el entonces Gobernador de Puerto Rico, Hon. Pedro J. Rosselló González, para ocupar el cargo de Directora Ejecutiva del Consejo de Desarrollo Ocupacional y Recursos Humanos (el "Consejo de Desarrollo Ocupacional" o el "Consejo") por el término de cuatro años, conforme dispone el Art. 5 de la Ley Núm. 97 de 18 de diciembre de 1991, según enmendada, 18 L.P.R.A. sec. 1584.

En mayo del 2000, el entonces Gobernador Rosselló González, promulgó la Orden Ejecutiva 2000-06 designando al Consejo de Desarrollo Ocupacional como el depositario y administrador de los fondos asignados a Puerto Rico por la Ley de Inversión en la Fuerza Trabajadora, el "Workforce Investment Act", Ley Núm. 105-220, 112 Stat. 946 (1998), 29 U.S.C. secs. 2801-2945 (2002) ("WIA" por sus siglas en

inglés).[2]  Los fondos WIA, que ascendían a $300 millones de dólares, pasaron entonces a ser administrados por el Consejo de Desarrollo Ocupacional.

El 2 de enero de 2001 y luego de las elecciones generales celebradas en Puerto Rico en noviembre de 2000, la Hon. Sila M. Calderón juramentó como Gobernadora de Puerto Rico.  La Gobernadora Calderón designó al licenciado Víctor Rivera Hernández como Secretario del Departamento del Trabajo.  Éste  también asumió su cargo el 2 de enero de 2001.

El 3 de enero de 2001, la Gobernadora promulgó la Orden Ejecutiva-2001-03 como medida de control del gasto público y para propiciar la estabilidad fiscal del gobierno, ante lo que se estimaba iba a ser un  presupuesto deficitario para ese año fiscal.  Así, la Orden Ejecutiva dispuso que todos los puestos en el servicio de carrera que estuvieran vacantes en ese momento permanecieran sin ocupar.  Dispuso además que se requiriera la autorización previa del Secretario de la Gobernación cuando fuera

---

[2] En el año 1998, el Congreso de los Estados Unidos promulgó el "Workforce Investment Act" ("WIA" por sus siglas en inglés) para promover la inversión en la fuerza trabajadora propiciando el empleo y la retención en el empleo de los trabajadores beneficiarios.  Procura también esta ley federal mejorar el adiestramiento ocupacional de los participantes como mecanismo para reducir el desempleo.  29 U.S.C. sec. 2811 (2002).  Para recibir fondos WIA, el estado, incluyendo el Estado Libre Asociado de Puerto Rico, debe crear una entidad gubernamental que formule un plan estratégico sobre cómo se invertirán estos fondos en beneficio de la fuerza trabajadora.  A esos efectos, la Orden Ejecutiva 2000-06 creó la Junta Estatal.

necesario ocupar alguna de las vacantes existentes en las agencias del Estado Libre Asociado. Además, la Orden requirió la previa autorización del Secretario de la Gobernación cuando se fuera a otorgar o enmendar algún contrato de servicios profesionales o consultivos. La Orden Ejecutiva 2001-03 iba dirigida a "cualquier junta, cuerpo . . . comisión, corporación pública, departamento . . . autoridad . . . o cualquier instrumentalidad del Poder Ejecutivo del Estado Libre Asociado."

La demanda instada alega que a raíz del nombramiento del licenciado Rivera Hernández y éste asumir el cargo de Secretario del Trabajo, la señora Santana comenzó a experimentar acciones discriminatorias en su contra que culminaron con su destitución como Directora Ejecutiva del Consejo de Desarrollo Ocupacional. Se arguye que dichas acciones fueron motivadas por su afiliación política al Partido Nuevo Progresista.

La carta de destitución enviada por la señora Gobernadora a la señora Santana, de fecha de 7 de marzo de 2001, indicaba lo siguiente:

> Usted funge como Directora Ejecutiva del Consejo de Desarrollo Ocupacional y Recursos Humanos ('CDORH'). Como tal, participa en la operación y dirección del desarrollo ocupacional y de recursos humanos del Estado Libre Asociado lo que conlleva, entre otras cosas, la implantación de programas para desarrollar la inversión el las fuerzas trabajadoras de Puerro Rico. Sus funciones por lo tanto son de naturaleza puramente ejecutiva.

. . .

[U]sted ha realizado unos actos que denotan incumplimiento e insubordinación a la Orden Ejecutiva OE-2001-03 y las ordenes (sic) y directrices del Secretario del Trabajo, Hon. Victor (sic) Rivera Hernández, como es su deber en Ley. Entre los hallazgos de incumplimiento y de insubordinación se encuentran los siguientes: (1) usted realizó tres nombramientos sin autorización mía, del Secretario de la Gobernación o del Secretario del Trabajo; (2) usted realizó un viaje a California para asuntos oficiales, sin la notificación y aprobación del Secretario del Trabajo; (3) usted anunció al personal del consejo una reorganización del Plan de Clasificación de puestos de carrera sin el consentimiento del Secretario del Trabajo; (4) usted autorizó cinco órdenes (sic) de compras de equipos entre el 22 de enero y el 9 de febrero de 2001; y (5) usted ocasionó la devolución de $1,476,070.81 de fondos federales del Título III, y ésta resultó ser una decisión incorrecta, ya que dichos fondos eran necesarios para los asuntos relacionados de cierre de empresas.

Así las cosas, en mayo de 2001, la señora Santana y su esposo presentaron ante la Corte de Distrito de los Estados Unidos para el Distrito de Puerto Rico una demanda por discrimen político bajo la ley federal de derechos civiles, 42 U.S.C. sec. 1983. En la misma, solicitaron daños compensatorios y punitivos y que se expidiera un remedio interdictal. Se demandó en su capacidad personal como oficial a la señora Gobernadora, al Secretario del Trabajo, al Director del Consejo, Xavier González Calderón y al representante en la Región II del Departamento del Trabajo de los Estados Unidos, el señor Ralph Muñiz.

La demanda instada contiene tres reclamaciones principales bajo la legislación federal de derechos civiles, a saber: una reclamación por violación a la

Primera Enmienda por alegado discrimen por afiliación política; una reclamación por violación a la cláusula de debido proceso de ley de la Enmienda Decimocuarta de la Constitución de los Estados Unidos en su vertiente procesal, bajo el fundamento que la señora Santana tenía un interés propietario en su empleo; y, una tercera reclamación en la cual se arguyó que los demandados conspiraron entre sí para destituirla de su puesto.[3]

En respuesta a la demanda instada los demandados, en su capacidad personal, presentaron una moción de desestimación fundamentada principalmente en la doctrina de inmunidad condicionada ("qualified inmunity"). En la moción presentada solicitaron la desestimación del caso bajo el fundamento que, primero, la destitución de la señora Santana no violaba sus derechos bajo la Primera Enmienda toda vez que el puesto que ella ocupaba era uno que implantaba política pública por lo que el requisito de afiliación política para dicho cargo era apropiado. Segundo, que no se le había violado el debido proceso de ley toda vez que ella no tenía un derecho propietario sobre

---

[3] Los demandantes incluyeron además una reclamación por violación a la Ley Núm. 100 de 30 de junio de 1959, según enmendada, 29 L.P.R.A. secs. 146 *et. seq.*, por discrimen; una reclamación en daños y perjuicios bajo el Artículo 1802 y 1803 del Código Civil, 31 L.P.R.A. secs, 5141, 5142; una reclamación directamente bajo la Constitución de los Estados Unidos por discrimen ("Bivens claim") y, finalmente, una causa de acción por violación al Consolidated Omnibus Budget Reconciliation Act ("COBRA"), Pub. L. No. 99-272, 100 Stat. 228, 29 U.S.C. secs. 1162, *et seq.*

el puesto que desempeñaba. Tercero, que no concurrían en este caso los requisitos necesarios para establecer una causa de acción por conspiración bajo el estatuto federal de derechos civiles. Finalmente, los demandados levantaron la defensa de inmunidad condicionada por lo que solicitaron la desestimación de la demanda instada en su capacidad personal.

El 14 de febrero de 2002, la Corte de Distrito emitió una opinión en la cual acogió algunos de los planteamientos de los demandados, desestimando por lo tanto la causa de acción de discrimen político bajo la Primera Enmienda y la causa de acción de conspiración bajo 42 U.S.C. sec. 1985(3). *Santana v. Calderón*, 188 F. Supp. 160 (D.P.R. 2002). La Corte de Distrito denegó la solicitud de desestimación de la causa de acción por alegada violación al debido proceso de ley en su aspecto procesal.

Inconformes con la determinación, los demandados instaron una apelación interlocutoria ante la Corte de Apelaciones de los Estados Unidos para el Primer Circuito. En el recurso instado se impugnó la determinación del tribunal *a quo* de denegar la desestimación de la reclamación de violación del debido proceso de ley en su aspecto procesal. La Corte de Apelaciones revocó a la Corte de Distrito y determinó que, en efecto, los demandados estaban protegidos por la doctrina de inmunidad condicionada respecto la reclamación bajo la cláusula de

debido proceso de ley en su vertiente procesal. Véase,
*Santana v. Calderón*, 342 F.3d 18 (1st Cir. 2003).

El foro apelativo concluyó que al momento de los hechos que dieron base a la reclamación de la señora Santana, no estaba claramente establecido que ésta tuviese un derecho propietario sobre el cargo que ocupaba, por lo que procedía desestimar reclamación instada contra los demandados en su capacidad personal. La Corte de Apelaciones, razonando por analogía y aplicando la jurisprudencia del Tribunal Supremo sobre la facultad del Presidente de destituir funcionarios de la Rama Ejecutiva, concluyó que la Gobernadora muy bien podía tener la facultad constitucional de destituir a la señora Santana como Directora Ejecutiva del Consejo. Reconociendo que ello no ha sido resuelto por este Tribunal, concluyó que no estaba claramente establecido que tal curso de acción era o no procedente, lo que permitía que los demandados estuviesen cobijados por inmunidad condicionada al destituirla del cargo.[4]

---

[4] Sobre este particular la Corte de Apelaciones de los Estados Unidos para el Primer Circuito indicó en *Santana v. Calderón*, 342 F.3d 18, 30-31 (1st Cir. 2003) lo siguiente:

> We cannot conclude that the defendants had notice that their removal of the plaintiff from her position would violate clearly established law. Given the purely executive nature of the Executive Director position, the position's limited policy making function, and the Governor's general power of removal, it was reasonable for defendants to believe that Santana did not have a property interest in continued

La Corte de Apelaciones devolvió el caso al tribunal de instancia para que prosiguieran los procedimientos en cuanto a las otras reclamaciones incluidas en la demanda instada.  La Corte instó al foro inferior a consultar con las partes sobre la deseabilidad de certificar a este Tribunal la controversia sobre la existencia o no de un derecho propietario sobre el cargo de Director Ejecutivo del Consejo de Desarrollo Ocupacional.  Señaló dicho foro específicamente: "Only the Supreme Court of Puerto Rico can definitively resolve this property right issue.  Therefore, we urge the district court, as it proceeds with the suit for injunctive relief and the other claims against the defendants, to consult with the parties about the appropriateness of certifying to the Puerto Rico Supreme Court the Commonwealth constitutional issue relating to the removal power of the Governor."  342 F.3d, pág. 31.

Así las cosas, el pasado 2 de septiembre de 2004 la Corte de Distrito presentó ante la Secretaría de este Tribunal una solicitud de certificación expedida por el Hon. Juez Jaime Pieras, ante quien se ventila el caso de epígrafe.  Aceptada la certificación ínter jurisdiccional presentada, le concedimos a ambas partes un término simultáneo para presentar sus respectivos alegatos.  Éstas

_____

employment and that her termination therefore was not subject to constitutional due process violation.

comparecieron y estando en posición de resolver pasamos a así hacerlo.

Antes de pasar a discutir propiamente la controversia de derecho planteada en este recurso, se hace necesario describir con mayor detenimiento las facultades encomendadas por ley al Director Ejecutivo del Consejo de Desarrollo Ocupacional ya, que como se discutirá mas adelante, ello incide directamente sobre la pregunta certificada.

B.

El Director Ejecutivo del Consejo de Desarrollo Ocupacional es el funcionario que dirige los trabajos administrativos y operacionales del Consejo. 18 L.P.R.A. sec. 1584. Es un cargo creado en virtud de la Ley Núm. 97 de 18 de diciembre de 1991, que se ejerce por el término fijo de cuatro años y su salario lo establece el Gobernador. *Id.*[5] La ley no dispone para la destitución de este funcionario.

El Consejo de Desarrollo Ocupacional, está compuesto por el Secretario de Educación, la Secretaria de la Familia, el Secretario de Desarrollo Económico, el Secretario del Trabajo —quien lo preside—, tres representantes del sector privado y tres del interés público. 18 L.P.R.A. sec. 1584. El Consejo fue el

---

[5] Este funcionario no es uno en el servicio de carrera conforme la Ley de Personal del Servicio Público del Estado Libre Asociado. 3 L.P.R.A. sec. 1301.

mecanismo diseñado por el legislador para administrar y regir el Sistema de Formación Tecnológico Ocupacional del Estado Libre Asociado de Puerto Rico. 18 L.P.R.A. sec. 1584. El Sistema agrupa el "conjunto de agencias, programas o unidades operacionales que directa o indirectamente ofrecen servicios relacionados con la formación tecnológica ocupacional no universitaria." 18 L.P.R.A. sec. 1582. Formación tecnológico ocupacional es "el proceso sistemático formal para proveer a cada participante los conocimientos y experiencias para desarrollar las competencias que le permitan ingresar en un empleo, retenerlo y mejorar en su condición de trabajo." 18 L.P.R.A. sec. 1581(b).

El Director Ejecutivo y el Consejo de Desarrollo Ocupacional, tienen a cargo desempeñar las siguientes funciones, entre otras: (1) **"[i]mplanta[r] y hace cumplir la política pública que se establece en esta legislación y aquella otra que en el futuro pueda establecerse con relación a la educación técnico-ocupacional y a los propósitos de este capítulo"**; (2) establece[r] los objetivos del Sistema **"de acuerdo a la política pública establecida"**; (3) establecer los niveles de competencias mínimas que deben poseer los alumnos del Sistema; (4) establecer las normas necesarias para la "consolidación de dos o mas programas tecnológicos u ocupacionales del Sistema"; (5) someter la petición presupuestaria de los

componentes del Sistema a la Oficina de Presupuesto y Gerencia: (6) ser el depositario y administrar los fondos que recibe Puerto Rico bajo la ley federal de Educación Vocacional y Tecnológica Aplicada Carl D. Perkins.   18 L.P.R.A. secs. 1585(a), (b), (e), (g), (k), (w).   (Énfasis nuestro.)

Además, como indicamos al inicio, en virtud de la Orden Ejecutiva 2000-06, el Consejo de Desarrollo Ocupacional es el depositario y administrador de los fondos WIA que recibe Puerto Rico del gobierno federal, los cuales ascienden a $300 millones de dólares.[6]  Le corresponde al Director Ejecutivo del Consejo, auditar las juntas locales y regionales que reciben estos fondos para cerciorarse del cumplimiento con la reglamentación estatal y federal aplicable.  Véase, Segunda demanda enmendada, par. 4.9.  El Director Ejecutivo además participa en la evaluación de propuestas sometidas para recibir estos fondos y en la autorización eventual de los correspondientes desembolsos. *Id.*

Con ese trasfondo, pasemos entonces, a evaluar la controversia relativa a la facultad constitucional del Gobernador de remover a funcionarios por él nombrados.

---

[6] La Orden Ejecutiva 2000-06 indica lo siguiente:
> "The Executive Director of the Occupational Development and Human Resources Council shall be responsible and accountable to the State Board for the receipt, custody and disbursement of the federal funds received pursuant to WIA and shall post fidelity bond prescribed by the laws of Puerto Rico for public employees."

Primero, haremos una breve reseña del mecanismo de certificación y su importancia. Luego, un recuento histórico de la facultad de destitución de un gobernador previo a la adopción de la Constitución; para finalmente analizar la controversia certificada en el contexto del alcance de la cláusula de nombramiento de la Constitución. Veamos detenidamente.

## II

El ordenamiento procesal civil puertorriqueño reconoce dos tipos de certificación, la intra jurisdiccional y la ínter jurisdiccional. El caso de autos involucra la certificación ínter jurisdiccional la cual está regulada por el Art. 3.002(f) de la Ley Núm. 201 del 22 de agosto de 2003, 4 L.P.R.A. sec. 24s(f), la Regla 53.1(f) de las de Procedimiento Civil, y la Regla 25 del Reglamento del Tribunal Supremo.

La certificación ínter jurisdiccional es un mecanismo procesal efectivo que permite mitigar las tensiones inherentes a un sistema de justicia federalista donde coexisten en una misma jurisdicción dos sistemas judiciales soberanos, el sistema federal y el sistema estatal. Mediante la certificación, uno de esos soberanos procura la asistencia del segundo para que éste emita un pronunciamiento definitivo sobre una cuestión dudosa de derecho, anunciando así un nuevo principio legal. Nash, Examining the Power of Federal Courts to Certify Questions

of State Law, 88 *Cornell L. Rev.* 1672, 1690 (2003); Calabresi, Federal and State Courts: Restoring a Workable Balance, 78 *N. Y .U. L. Rev.* 1293 (2003).

Este procedimiento adelanta los intereses tanto del sistema judicial federal como el sistema judicial estatal. En *Arizonans for Official English v. Arizona*, 520 U.S. 43, 76 (1997) (Ginsburg, J.), el Tribunal Supremo indicó lo siguiente, sobre los beneficios que deriva el sistema federal de la correcta utilización del procedimiento de certificación: "[Certification] allows a federal court faced with a novel state-law question to put that question directly to the State's highest court, reducing the delay, cutting costs, and increasing the assurance of gaining an authorative response." Véase, Braun, A Certification Rule for California, 36 *Santa Clara L. Rev.* 935, 940 (1996) ("from a federal court's point of view, allowing certification of an uncertain point of state law avoids both the necessity of time-consuming speculation on the unfamiliar law of a foreign jurisdiction and the possibility of . . . error.") En igual sentido, Kaye, Weissman, Interactive Judicial Federalism: Certified Questions in New York, 69 *Fordham L. Rev.* 373, 378 (2000); Sloviter, A Federal Judge Views Diversity Jurisdiction Through the Lens of Federalism, 78 *Van. L. Rev.* 1671, 1679–80 (1992); Carr, Robbins, Interjurisdictional Certification and Choice of Law, 41 *Vand. L. Rev.* 411, 415 n. 11 (1988).

Por lo tanto, consideraciones de eficiencia en la tramitación de los casos, certeza judicial, cortesía ("comity") y deferencia al más alto tribunal estatal, son algunas de las consideraciones que abonan a la utilización del mecanismo de certificación por el foro federal.

Desde la óptica del sistema judicial estatal la certificación ínter jurisdiccional es también un mecanismo de gran utilidad y beneficio. En *Pan Ame. Comp. Corp. V. Data Gen. Corp.,* 112 D.P.R. 780, 785 (1982) indicamos que este mecanismo permite "preservar y respetar la función prístina de las cortes estatales de interpretar y formular el derecho de los estados." Véase además, *Guzmán Vargas v. Calderón*, res. el 23 de marzo de 2005, ___ D.P.R. ___, 2005 JTS 38. De esta forma las prerrogativas de un estado de establecer, definir y delimitar los linderos de su Derecho se salvaguardan. Se propicia y adelanta así una interrelación judicial armoniosa y de respeto mutuo entre los dos sistemas judiciales soberanos que conviven en el Estado Libre Asociado.

III

La Constitución del Estado Libre Asociado no contiene una disposición expresa que establezca la facultad del Gobernador de destituir funcionarios públicos. El único mecanismo de destitución que se recoge en la Constitución es el de residenciamiento. Art. III, sec. 21, Constitución del Estado Libre Asociado de Puerto Rico.

Ahora bien, históricamente, la facultad de remover o separar a un funcionario de su cargo por el Primer Ejecutivo había sido reconocida desde principios de Siglo XX, cuando en el año 1902 se aprobó el Código Político. Así, el Artículo 53 del Código Político de 1902 dispuso, al enumerar las prerrogativas del gobernador, que éste estaba facultado "para separar a cualquier funcionario que hubiere nombrado; podrá declarar vacante el cargo y cubrirlo en la forma prescrita por ley."[7] 3 L.P.R.A. sec. 6. Por lo tanto, nuestro ordenamiento contiene desde hace más de un siglo, una ley general donde se le reconoce esta prerrogativa al Primer Ejecutivo, sujeto a que ello ocurra de "la forma prescrita por ley." Por lo tanto, el Art. 53 aunque reconoció la facultad de destitución la condicionó a las restricciones prescritas por ley.

Por otro lado, en *Gelpí v. Leahy*, 56 D.P.R. 925, 926 (1940), al interpretar el Art. 49 del Acta Orgánica de 1917[8] que facultaba al Gobernador a nombrar jueces dijimos: "Ese artículo, . . . , otorga al Gobernador **el poder absoluto de**

---

[7] Luego de la aprobación de la Constitución del Estado Libre Asociado de Puerto Rico, el Art. 53 del Código Político fue enmendado para conformarlo al nuevo esquema de gobierno. El cambio no alteró en nada la facultad que allí se recoge, su lenguaje permaneció intacto.

[8] El Art. 49 del Acta Orgánica de 1917 disponía:
> "En lo sucesivo todos los jueces, marshalls y Secretarios de los tribunales establecidos actualmente o que se establecieron en adelante en Puerto Rico, y cuyo nombramiento por el Presidente no esté dispuesto por ley, serán nombrados por el Gobernador con el concurso y consentimiento del Senado de Puerto Rico."

**destituir como inherente al poder de nombrar."** (Énfasis nuestro.)

Vemos así, cómo al momento de adoptar nuestra Constitución existía ya en Puerto Rico una normativa estatutaria y jurisprudencial que reconocía como ínsito al poder de nombrar del Gobernador, el concomitante poder de destituir; facultad que describimos en *Gelpí* como absoluta.

Analicemos entonces el texto de la Constitución del Estado Libre Asociado de Puerto Rico.

B.

Al adoptarse la Constitución en el 1952, los Constituyentes procuraron una estructura de gobierno compuesta por tres poderes co-iguales, subordinados todos a la soberanía del pueblo. Art. I, sec. 2, Constitución del Estado Libre Asociado. Cada uno de estos poderes, aunque soberano e independiente respecto el ejercicio del poder conferido, interrelaciona con los otros manteniendo íntegra la autoridad de cada cual. *Pueblo v. Santiago Feliciano*, 139 D.P.R. 361, 420 (1995). Como muy acertadamente señaló el Juez Asociado Jackson, en su opinión concurrente en *Youngstown Sheet & Tube Co. V. Sawyer*, 343 U. S. 579, 635 (1952): "While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon the branches separateness but interdependence, autonomy but reciprocity."

La doctrina de separación de poderes se asienta precisamente sobre el principio que el poder se delega en las tres ramas de gobierno para así "evitar la concentración de poderes en una sola rama, o el abuso de poder de parte de otra". *Santiago Feliciano, ante*. La existencia de tres poderes co-iguales genera necesariamente tensión y fricción entre las ramas que se aminora mediante un sistema de pesos y contrapesos, que permite calibrar el fino equilibrio en el ejercicio del poder, según lo ordena la Constitución. Véase, *Hernández Agosto v. López Nieves*, 114 D.P.R. 601 (1983); *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407 (1982); *Banco Popular v. Corte*, 63 D.P.R. 66 (1947).

El Art. IV de la Constitución describe el alcance del Poder Ejecutivo. En la sección 1, Art. IV, se dispuso específicamente que el Poder Ejecutivo lo ejerza el Gobernador. De otra parte, la sección 4, Art. IV dispone que el Gobernador podrá "nombrar, en la forma que se disponga en esta Constitución o por ley, a todos los funcionarios para cuyo nombramiento esté facultado."

Durante el proceso de debate de la Asamblea Constituyente sobre el Poder Ejecutivo, el delegado señor Gutiérrez Franqui, propuso se eliminara de este Artículo una sección que le confería al Gobernador la siguiente facultad: "Ejercer la dirección general de la administración pública." El delegado Gutiérrez Franqui

objetó dicho lenguaje por entender que el mismo constituía

una limitación a las facultades constitucionales del

Gobernador. Indicaba el señor delegado Gutiérrez Franqui:

> Entonces, leyendo este artículo como fue aprobado en la Comisión Total, nos pareció que insertar esta expresión: 'ejercer la dirección general del poder ejecutivo del gobierno' podía aparecer como una limitación a la sección 1 donde decía que 'el poder ejecutivo' . . . cual es, 'se ejercerá por un gobernador'.
>
> Si aquí decimos que su atribución y función es supervisar, la dirección general, **eso no es ser jefe supremo del poder ejecutivo, a nuestro juicio, sino que más bien es una limitación a esa facultad.**
>
> Entendimos, que la forma de corregir la posible duda, era eliminar esa frase en su totalidad con esta explicación como propósito de la enmienda, **para que resultara claro de la acción de esta Convención, que había sido su propósito investir a este funcionario ejecutivo, a este jefe ejecutivo con la facultad y la autoridad suprema en el poder ejecutivo, sin limitaciones de ninguna clase.**

3 *Diario de Sesiones*, 1962, pág. 2272. (Énfasis nuestro.)

Véase además, J. Trías Monge, *Historia Constitucional de*

*Puerto Rico,* Ed. Universidad de Puerto Rico, 1982, Vol.

III, págs. 114-17.

Nuestra Constitución por lo tanto adoptó un Poder

Ejecutivo unitario al investir a un solo funcionario –el

Gobernador– con la autoridad suprema en la Rama Ejecutiva

"sin limitaciones de ninguna clase." Ello permite

impartirle dinamismo y unidad de propósito a la Rama

Ejecutiva; fortalece al Primer Ejecutivo en la protección

de sus prerrogativas constitucionales frente a lo que serán

intentos de socavar las mismas por las otras ramas; y le hace responsable único de la gestión de una de las tres ramas de gobierno frente a la ciudadanía.[9]

El investir al Gobernador con la facultad y autoridad suprema en el Poder Ejecutivo "sin limitaciones de ninguna clase", requiere, para que esa expresión tenga verdadero contenido que, como mínimo, el Primer Ejecutivo tenga la autoridad legal para impartir instrucciones u órdenes de carácter obligatorio a los funcionarios de la Rama Ejecutiva que nombra, para que se tomen las medidas que a su juicio adelanten la política pública del gobierno.[10] Ello a su vez supone que el Gobernador tiene la facultad de remover a ese funcionario si rehúsa actuar acorde a lo que es la política pública expresada por el Gobernador. Solo de esta forma el Primer Ejecutivo se cerciorará que se ejecuta la política pública establecida y se cumpla con la ley. En última instancia, el poder de destituir es equivalente al poder de controlar las acciones de los funcionarios del ejecutivo que formulan o contribuyen a formular política pública.[11]

---

[9] Véase sobre este particular, Calabresi, Some Normative Arguments for the Unitary Executive, 48 *Ark. L. Rev.* 23, 37-47 (1995); Currie, The Distribution of Power after *Bowsher*, 1986 *Sup. Ct. Rev.* 19, 31-36.

[10] Claro está, la acción que se exige del funcionario tiene que estar enmarcada dentro de sus atribuciones discrecionales. Véase, Miller, Independent Agencies, 1986 *Supreme Court Review* 41, 59.

[11] Véase, Calabresi, Normative Arguments for the Unitary Executive, 48 *Ark. L. Rev.* 23, 58 (1995).

Por otro lado, la sección 4 del Art. IV de la Constitución, enumera los deberes, funciones y atribuciones constitucionales del Gobernador, entre las que se encuentra la obligación de "cumplir y hacer cumplir las leyes." Para cumplir con esta obligación constitucional el Gobernador tiene que nombrar funcionarios que le puedan asistir en dicha encomienda. Es evidente que no es posible que tal responsabilidad recaiga exclusivamente sobre una persona.

La esencia del concepto poner en vigor la ley "no es la mera interpretación e implementación del mandato legislativo, sino es determinar **quién ejerce la última autoridad sobre los oficiales que implementan la ley**." *Noriega v. Hernández Colón*, 112 D.P.R. 406, 463 (1994). (Énfasis nuestro.) Secuela entonces de la obligación de cumplir y hacer cumplir la ley que impone la Constitución, está el poder de ejercer "la última autoridad sobre . . . [los] oficiales" que asisten al Gobernador en el descargo de esa responsabilidad; lo que implica necesariamente el poder de remoción de quienes incumplan con esa responsabilidad.

Debemos entonces concluir, a la luz de los supuestos antes mencionados que, consustancial con la facultad constitucional de nombramiento del Primer Ejecutivo, está la de destituir a quien se nombra. Véase, *In re Marín Báez*, 81 D.P.R. 274, 278 n. 3 (1959). ("Quedaría como única alternativa, la de recurrir al poder inherente del

Ejecutivo para destituir a los funcionarios que él nombra.") Prerrogativa que como vimos, no era foránea a nuestro ordenamiento cuando se aprobó la Constitución en el 1952.

C.

El contenido y alcance del poder de nombramiento del Gobernador y la facultad de éste de destituir a funcionarios subordinados a él, es un tema que recientemente abordamos, como resultado también de una solicitud de certificación. *Guzmán Vargas v. Calderón*, *ante*. Hoy lo abordamos nuevamente.

La discusión habida durante el proceso de adopción de la Constitución, específicamente en lo que se refiere a los poderes de la Asamblea Legislativa, nos sirven como punto de partida, como siempre, para deslindar el alcance de estas facultades del Gobernador frente a las prerrogativas de la Asamblea Legislativa.

El Art. III de la Constitución sobre los poderes de la Asamblea Legislativa, contenía un lenguaje que facultaba a la Asamblea Legislativa a "determinar las funciones, deberes y el término de servicios de los secretarios de gobierno". Contenía además otra disposición que proveía que: "[n]ingún secretario de gobierno desempeñará su cargo por un término que exceda al de la incumbencia del Gobernador que lo nombró." El delegado señor Gutiérrez Franqui propuso que dichas disposiciones se eliminasen,

invocando para ello lo resuelto por el Tribunal Supremo de los Estados Unidos en *Myers v. United States*, 272 U. S. 52 (1926) y *Humphrey's Executor v. United States*, 295 U. S. 602 (1935). Casos éstos donde se discutió extensamente el alcance de la cláusula de nombramiento de la Constitución de los Estados Unidos y las limitaciones que le impone al ejercicio del poder del Congreso. Por su relevancia a la controversia que hoy nos ocupa, citamos *in extenso*:

> Al examinar cuidadosamente esta disposición, **nos asaltó la duda de si era facultad propia de la Asamblea Legislativa, en un gobierno de sistema republicano,** y en donde la Asamblea Legislativa tiene la facultad de aprobar leyes por encima del veto del Gobernador, **que el poder legislativo pudiera tener la facultad, de variar a su antojo, el término de duración de los cargos de los secretarios de gobierno; o de variar a su antojo, la especificación de sus funciones.**
>
> En nuestro estudio del problema, fuimos a buscar la fuente del derecho constitucional americano, y en primer término nos encontramos con que la Constitución de los Estados Unidos nada dice sobre las funciones y el término de duración de los cargos de los miembros del Gabinete. Al encontrarnos con esa situación en la Constitución federal, empezamos a buscar la historia judicial de interpretación que pudiera haber sobre el particular, y encontramos que el problema fue uno objeto de amplia consideración y discusión por los federalistas y por los primeros comentaristas de la Constitución americana.
>
> . . .
>
> La primera controversia judicial que surge en torno al problema, [. . .] se conoce en la jurisprudencia [. . . ] como el caso *Myers*. El caso *Myers* sostuvo que la Constitución de los Estados Unidos, al concederle al Presidente la facultad de nombramiento, **le concedió como ingrediente indispensable de esa facultad, la facultad de destitución en cualquier momento; y que ninguna disposición del Congreso de los**

**Estados Unidos podía fijarle término a un funcionario del [poder] ejecutivo que fuese válido, contra la facultad absoluta del [jefe] ejecutivo de removerlo en cualquier momento.**

. . .

Así fue que la situación llegó a la corte, y es en esa fecha en que se modifica la regla absoluta, en el caso de *Myers*, y se decide que la Constitución de los Estados Unidos, al guardar silencio sobre el término de duración de los cargos de los miembros del Gabinete, y al no autorizar específicamente al Congreso para legislar sobre la materia, había procedido sobre la base, de que siendo esos cargos de naturaleza tal que pertenecían a la rama ejecutiva, en su propia esencia, el poder del Presidente de nombrar y destituir en esos cargos era absoluto; y que en eso se confirmaba la doctrina del caso de *Myers*.

Pero señaló el caso de *Humphrey's* que la regla no es así, cuando se trata de nombramientos que el Presidente hace, pero que, en primer lugar, no son de la esencia misma del poder ejecutivo, o son nombramientos que hace para personas que desempeñan funciones en una de las otras dos ramas del gobierno. Bien sea en la rama legislativa, o en la rama judicial, o en los organismos de carácter cuasi judicial. O sea, que la facultad del Presidente de los Estados Unidos para nombrar una persona en la rama legislativa, que le fuera señalada por ley, tiene que regirse con todas las limitaciones que la ley le imponga. Y si le impone un término de tiempo, ese término de tiempo es superior al poder del [jefe] ejecutivo al hacer la designación.

Si la ley le concede al Presidente de los Estados Unidos la facultad de hacer un nombramiento de carácter judicial, o para una junta u organismo de carácter cuasi judicial, y le fija un término, entonces el término es obligatorio para el Presidente, y no puede disponer del cargo sin sujeción a lo que la ley disponga en cuanto al término. **Que donde es claro, que el Congreso no puede intervenir para fijarle términos de duración a los cargos, es en relación con aquellos, que por ser de naturaleza esencialmente de la rama judicial [debe decir ejecutiva], la Constitución no les dispuso**

**término, y, por consecuencia, el poder de remover estaba implícito en la facultad de nombrar.**

Señor Presidente y compañeros delegados: **el propósito de esta enmienda que tengo ahora el honor de proponerles, es sencillamente que adoptemos la manera de bregar con el asunto que establece la Constitución de los Estados Unidos, con la interpretación judicial de la misma en la forma en que la hemos expuesto.**

3 *Diario de Sesiones*, págs. 2269-2270.

Como vemos, al aprobarse nuestra Constitución hicimos nuestro el modelo de análisis expuesto en *Myers* y *Humphery´s Executor,* para evaluar bajo qué circunstancias la Asamblea Legislativa puede imponer restricciones al Gobernador para destituir funcionarios del Ejecutivo. Es decir, lo resuelto en estos casos determina cuáles son **los contornos del poder de nombramiento del Gobernador y su facultad de destitución y, la limitación que ese poder necesariamente representa para el ejercicio de las prerrogativas de la Asamblea Legislativa.** Ciertamente, en lo que se refiere a funcionarios cuyas funciones son de la esencia misma del Poder Ejecutivo, adoptar lo resuelto en *Myers*, es cónsono con la visión adoptada en la Constitución de que el Gobernador está investido con todo el poder Ejecutivo sin "limitación de ninguna clase."

A la luz de lo anterior y, habida cuenta de que la Constitución del Estado Libre Asociado calca a grandes rasgos la estructura de gobierno plasmada en la Constitución de los Estados Unidos, es apropiado que repasemos, con mayor detenimiento, cómo este tema ha sido

atendido por el Tribunal Supremo de los Estados Unidos; prestando particular atención a lo resuelto en *Myers* y *Humphrey's Executor.*

D.

La Constitución de los Estados Unidos no le asigna al Presidente el poder para destituir oficiales federales a él subordinados. De otra parte, la cláusula de nombramiento de dicha Constitución, contraria a la nuestra, establece dos clases de funcionarios que puede nombrar el Presidente. Los llamados "oficiales principales" cuyos nombramientos recaen exclusivamente en el Primer Ejecutivo, y los llamados "oficiales inferiores" los cuales pueden ser nombrados por el Presidente, los tribunales de justicia, o los jefes de departamentos, conforme se disponga en ley. Art. II, sec. 2, cl. 2, Constitución de los Estados Unidos.

Ahora bien, aun cuando la Constitución guarda silencio sobre la facultad de remoción del Presidente, el Tribunal Supremo resolvió temprano en su historia constitucional que el poder de destitución del Presidente es incidental al poder de nombramiento. *Ex parte Hennen*, 38 U. S. (13 Pet) 230, 259 (1839); *Keim v. United States*, 177 U. S. 290, 293-94 (1900); *Shortleff v. United States*, 189 U. S. 311, 314-15 (1903). Además, se ha resuelto que el poder de destitución es inherente a la facultad y responsabilidad

del Presidente de asegurarse que se cumple fielmente con la ley. *Myers v. United States*, 272 U. S. 52, 163-64 (1926).

El alcance y los contornos del poder de nombramiento del Presidente y la facultad de destitución quedó plasmado, principalmente, por una trilogía de casos del Tribunal Supremo, a saber: *Myers, ante*; *Humphrey's Executor ante*; y, *Wiener v. United States*, 357 U. S. 349 (1958).

En *Myers,* el Tribunal Supremo declaró inconstitucional un estatuto federal que disponía que los directores del correo de los Estados Unidos ("Postmasters") -nombrados por un término fijo de cuatro años- podían ser destituidos por el Presidente sólo "con el consejo y consentimiento" del Senado. El Tribunal determinó que el Congreso no podía interferir con la función constitucional del Presidente de hacer cumplir las leyes limitando su control sobre funcionarios ejecutivos nombrados para asistirlo en esa labor. *Myers*, 272 U.S. pág 119 ("the President has the exclusive power of removal of executive officers of the United States whom he has appointed by and with the advise and consent of the Senate.") El Tribunal Supremo concluyó su opinion indicando lo siguiente:

> Our conclusion on the merits, sustained by the arguments before stated, is that **article 2 grants to the President the executive power of the government, i.e., the general administrative control of those executing the laws, including the power of appointment and removal of executive officers, a conclusion confirmed by his obligation to take care that the laws be faithfully executed;** . . . and, finally, that to hold otherwise would make it impossible for the

> President, in case of political or other difference with the Senate or Congress, to take care the laws be faithfully executed. (Énfasis nuestro.)

*Myers*, 272 U. S. pág. 163-64. L. Tribe, *American Constitutional Law*, Foundation Press, 2000, 3rd ed., pág. 703. ("*Myers*. . . .is the primary source of the modern theory of removal"); Currie, The Distribution of Powers after *Bowsher*, 1986 *Supreme Court Review* 19, 34 ("Congress cannot deprive the President of the Executive Power. . . . Thus the Court was plainly right in *Myers v. United States*, that Congress could not forbid the President to discharge the Postmaster.")

Posteriormente, en *Humphrey's Executor,* el Tribunal avaló una restricción sobre la facultad del Presidente para destituir a los comisionados del "Federal Trade Commission" ("FTC" por sus siglas en inglés). Bajo la ley impugnada, el Presidente sólo podía destituir a los comisionados por "ineficiencia, negligencia en el cumplimiento del deber, o mal manejo en el descargo de sus funciones." 295 U. S. pág. 619 ("innefficiency, neglect of duty or malfeasence in office.") El Tribunal Supremo razonó, luego de analizar las funciones de los comisionados del FTC que, éstos ejercían poderes "cuasi legislativos" y "cuasi judiciales" y no funciones de naturaleza ejecutiva como ocurría en *Myers,* por lo que el Congreso podía válidamente limitar el poder de destitución del Presidente. El tribunal indicó:

**We think it plain under the Constitution that illimitable power of removal is not possessed by the President in respect of officers of the character of those just named.** The authority of Congress, in creating quasi legislative or quasi judicial agencies, to require them to act in discharge of their duties independently of executive control cannot well be doubted; and that authority includes, as an appropriate incident, power to fix the period during which they shall continue, and to forbid their removal except for cause in the meantime.

*Humphrey's Executor*, 295 U. S. pág. 629. [12] Por lo tanto el análisis elaborado en *Humphrey´s* es uno de carácter funcional, pues las limitaciones que pueda imponer el Congreso sobre la facultad de nombramiento del Presidente se evaluará a la luz de las funciones que desempeña el oficial.

En *Wiener*, el Tribunal Supremo llegó a un resultado similar al de *Humphrey´s Executor*, al avalar una reclamación de despido injustificado de un miembro del "War Claims Commission" (la "Comisión"), quien había sido

---

[12] La distinción hecha en *Humphrey's Executor v. United States*, 295 U. S. 602 (1935), entre funcionarios ejecutivos *versus* cuasi legislativos o cuasi judiciales, fortaleció la independencia de lo que se ha llamado la Cuarta Rama del gobierno ("the Headless Fourth branch"), a saber: las agencias o comisiones reguladoras, entre otras, *i.e.*, el "Securities and Exchange Commission", el "Federal Trade Commission", el "Federal Reserve Board" y el "Federal Communications Commission". El profesor Fried, indica lo siguiente: "The independence of the independent agencies is primarily due to the fact that their members do not – like most officers in the Executive Branch— serve at the pleasure of the President. Rather, under a variety of statutory formulations, they may be removed only for misbehavior." C. Fried, *Order & Law*, Simon & Schuster, 1991, págs. 155-56. Véase además, Miller, *op cit,* págs. 64-65

removido de su cargo por el Presidente Eisenhower.  La ley habilitadora de la Comisión disponía que los cargos de comisionado se ejercieran durante el período que estuviera vigente la Comisión y no proveía para la destitución de sus miembros.  El Tribunal Supremo determinó que la Comisión se estableció como un cuerpo de naturaleza adjudicativo por lo que el Presidente no podía destituir a los miembros a su antojo.  375 U. S. pág. 345.

De un análisis en conjunto de estos tres casos se pueden extraer los siguientes principios:  Primero, que el poder del Presidente para remover a un oficial cuyas funciones son puramente ejecutivas, es absoluto.  El segundo principio postula que cuando las funciones que ejerce el funcionario ejecutivo gozan o participan de los atributos de la función legislativa o judicial, el Congreso sí tiene autoridad para condicionar la destitución de ese funcionario de su cargo, imponiendo por ejemplo, el requisito de justa causa para la destitución.

E.

Nuestra discusión sobre el alcance de la facultad de destitución del Presidente quedaría trunca si no hiciéramos referencia a lo resuelto por el Tribunal Supremo en *Morrison v. Olson*, 487 U.S. 654 (1988); la más reciente expresión de dicho Tribunal sobre la facultad de nombramiento y el poder de destitución del Presidente. Veamos.

A raíz del escándalo de Watergate, específicamente en respuesta al incidente conocido comúnmente como "Saturday Night Massacre", cuando el Presidente Nixon destituyó fulminantemente al Fiscal Especial Archibald Cox quien investigaba los incidentes de Watergate, el Congreso aprobó el "Ethics in Government Act". 28 U.S.C. secs. 591-599 (1994).[13] Esta ley, entre otras cosas, creaba la figura del Fiscal Independiente y disponía que este funcionario era designado por un panel especial de jueces establecido en la ley, 28 U.S.C. secs. 592(a)(1), (c)(1) (1994), y solo podía ser removido por el Secretario de Justicia por justa causa o por incapacidad mental o física. 28 U.S.C. sec. 596(a)(1) (1994).[14]

---

[13] La ley que creó el Fiscal Independiente expiró el 30 de junio de 1999 al no ser reautorizada por el Congreso. Sobre el controversial cargo del Fiscal Independiente véase, Fried, *op. cit*; Ryan, Consels, Councils and Lunch: Preventing Abuse of the Power to Appoint Independent Counsels, 144 *U. Pa. L. Rev.* 2537 (1996); O´Sullivan, The Independent Cousel Statute: Bad Law, Bad Policy, 33 *Am. Crim. L. Rev.* 463 (1996); Martin & Zerhuse, The Independent Counsel, Checks and Balances, 58 *Geo. Wash. L Rev.* 536 (1990).

[14] Bajo esta ley, cuando el Secretario de Justicia recibiera información sobre posibles acciones criminales de altos funcionarios del gobierno, cobijados por la ley, éste tenía la obligación que llevar a cabo una investigación preliminar. 28 U.S.C. sec. 591(a) (1994). Si de la investigación preliminar surgía la necesidad de ampliar la misma, entonces el Secretario debía solicitar de un panel especial de jueces, creados por la ley y adscritos a la Corte de Apelaciones de los Estados Unidos para el Distrito de D.C., que designase un Fiscal Independiente. 28 U.S.C. secs. 592(a)(1), (c)(1) (1994). El panel especial entonces definía el alcance de la investigación criminal referida. 28 U.S.C. sec. 593(b)(1) (1994). Una vez nombrado el Fiscal Independiente tenía plena autoridad e independencia

En *Morrison,* se cuestionó la constitucionalidad de la ley.  Al enfrentarse a la controversia constitucional, el Tribunal Supremo tuvo que atender, como cuestión de umbral, si el Fiscal Independiente era un "oficial principal" cuyo nombramiento le correspondía al Presidente exclusivamente; o, por el contrario, un "oficial inferior" que podía ser nombrado no solo por el Presidente sino también por la Rama Judicial.

El Tribunal concluyó que el Fiscal Independiente era un "oficial federal inferior".  Ello así a base del análisis de cuatro criterios, a saber:  porque, éste podía ser destituido por un funcionario de alta jerarquía en la Rama Ejecutiva como lo era el Secretario de Justicia, 487 U.S. pág. 671; solamente se le delegaban facultades limitadas de procesamiento criminal y no tenía autoridad para formular política pública, *Íd., págs.* 671-72; su jurisdicción se limitaba a algunos altos funcionarios federales que se alegaba habían incurrido en violaciones a ciertos delitos de naturaleza grave, *Íd.,* pág. 672; y, el

_____

para investigar  y acusar.  El estatuto indicaba que el fiscal estaba investido con: "[the] full power and independent authority to exercise all investigative and prosecutorial functions and powers of the Department of Justice, the Attorney General and any other office or employee of the Department of Justice." 28 U.S.C. sec. 594(a) (1994).  Una vez nombrado, el Fiscal Especial solo podía ser destituido por el Secretario de Justicia por justa causa o por incapacidad mental o física.  28 U.S.C. sec. 596(a)(1) (1994).

término de nombramiento era limitado pues concluía una vez

finalizada su encomienda.  *Íd.*[15]

Atendido el problema de umbral, el Tribunal pasó a

analizar si alguna otra disposición de la Constitución

invalidaba el estatuto impugnado por contravenir la

doctrina de separación de poderes. Para enfrentarse al

planteamiento de separación de poderes, el Tribunal utilizó

un modelo de análisis que exigía se evaluase "la totalidad

de las circunstancias."[16]   Así, no tan solo había que

determinar el tipo de funcionario involucrado (*i. e.,*

ejecutivo, cuasi legislativo o cuasi judicial) sino

también, cómo la limitación impuesta por el Congreso al

Presidente incidía sobre su facultad de hacer cumplir las

leyes.  El Tribunal articuló este modelo de análisis al

indicar lo siguiente sobre el estatuto impugnado:  **"taken**

**as a whole** [it did not] impermissibly [. . .] undermined [.

. .] the powers of  the  Executive Branch [or] disrupt [. .

.] the proper balance between the coordinate branches [by]

---

[15] El profesor Tribe, quien compareció como amigo de la corte en *Morrison v. Olson*, 487 U.S. 564 (1988), en representación del Fiscal Independiente Lawrence Walsh que investigaba el escándalo de "Irán-Contra", critica severamente la conclusión del Tribunal y dice:
   "It seems a stretch, to say the least, to describe as an inferior, rather than principal officer of the United States, a government official empowered to embark on a largely unsupervised mission to take down a President."
L. Tribe, *American on Constitutional Law*, Foundation Press, 3rd ed., 2000, sec. 4-8, pág. 685.
[16] El professor Tribe describe este análisis como: "the seemingly unprincipled 'totality of the circumstances' test."  Tribe, *op. cit.*, pág. 696.

pervent[ing] the Executive Branch form accomplishing its constitutionally assigned functions." *Morrison*, 487 U. S. págs. 693, 695. (Énfasis nuestro.)

El Tribunal planteó la controversia ante sí de la siguiente manera:

> "[B]ut the real question is whether the removal restrictions are of such a nature that they impede the President's ability to perform his constitutional duty and the functions of the officials in question must be analyzed in that light."

487 U.S. pág. 691. Señaló además:

> We undoubtedly did rely on the terms 'quasi-legislative' and 'quasi-judicial' to distinguish the officials involved in *Humphrey's Executor* and *Wiener* from those in *Myers*, but our present considered view is that the determination of whether the Constitution allows Congress to impose a 'good cause' type restriction on the President's power to remove an official cannot be made to turn on whether or not that official is classified as 'purely executive'. **This analysis contained in our removal cases is designed not to define rigid categories of those officials who may or may not be removed at will by the President, but to ensure that Congress does not interfere with the President's exercise of the 'executive power' and his constitutionally appointed duty to 'take care that the laws be faithfully executed' under Article II.** *Myers* **was undoubtedly correct in its holding, and in its broader suggestion that there are some 'purely executive' official who must be removable by the President at will if he is to be able to accomplish his constitutional role.** (Énfasis nuestro.)

487 U.S. pág. 689.

Bajo este modelo de análisis, el Tribunal concluyó que el estatuto no disminuía impermisiblemente las

prerrogativas del Presidente ya que, aún cuando la ley limitaba el control del Presidente sobre las investigaciones criminales de altos funcionarios de gobierno, éste retenía "suficiente control" sobre el Fiscal Independiente para descargar sus prerrogativas constitucionales. *Íd*., pág. 696. Por lo tanto, el "Ethics in Government Act" no violaba la cláusula de nombramiento, ni tampoco la doctrina de separación de poderes, al no interferir impermisiblemente con las facultades del Primer Ejecutivo.

No hay duda que *Morrison* reformula el análisis funcional de *Humphrey's Executor* y *Wiener*, así como incide sobre *Myers.* Bajo *Morrison,* siempre habrá que analizar cómo la restricción impuesta por el Congreso incide sobre la obligación del Primer Ejecutivo de velar por el cumplimiento de las leyes, cuando de oficiales inferiores se trata, aun cuando éstos sean "funcionarios puramente ejecutivos". El modelo de análisis establecido en *Morrison* ha sido ampliamente criticado en la doctrina.[17]

---

[17] Véanse entre otros, Martin, *Morrison v. Olson* and Executive Power, *Tx. L. & Pol.* 511 (2000); Breker-Cooper, The Appointments Clause, and the Removal Power: Theory and Séance, 60 *Tenn. L. Rev*. 841 (1994); Libberman, *Morrison v. Olson*: A Formalistic Perspective on Why the Court was Wrong, 38 *Am. U. L. Rev*. (1989); Nagel, A Comment on the Rule of Law Model of Separation of Powers, 30 *Wm. & Mary L. Rev*. 355 (1989); Carter, Comment: The Independent Counsel Mess, 102 Harv. L. Rev. 105 (1988); Redish, Separation of Powers, Judicial Authority and the Scope of Art. III: The Troubling cases of *Morrison* and *Mistretta*, 39 *De Paul L. Rev*. 299 (1989); Werhan, Towards an Eclectic Approach to

En *Guzmán Vargas v. Calderón*, adoptamos el análisis de "totalidad de las circunstancias" de Morrison para deslindar la interrelación entre el poder de nombramiento y destitución del Gobernador frente a las prerrogativas de la Asamblea Legislativa.[18] Aclaramos en *Guzmán Vargas*, que el criterio principal para analizar si las disposiciones de un estatuto inciden sobre el poder del Primer Ejecutivo, lo será evaluar si la limitación impuesta interfiere "en forma impermisible e irrazonable con . . . [la facultad del Gobernador] de hacer cumplir y poner en vigor las leyes y de formular e implantar la política pública". *Guzmán Vargas*, pág. 21. Enfatizamos también que cuando se trate de funcionarios "puramente ejecutivos" "la facultad de la Rama Legislativa para imponer requisitos es mínima". *Íd*.

Procede entonces aplicar la normativa antes reseñada al caso ante nuestra consideración.

Veamos.

IV

Los hechos de este caso denotan, con meridiana claridad, que la posición de Director Ejecutivo del Consejo

_____

Separation of Powers: *Morrison v. Olson* Examined, 16 *Hastings Const. L. Q*. 393 (1989).

[18] Es de notar que en *Guzmán Vargas v. Calderón*, res. 23 de marzo de 2005, __ D.P.R. __, 2005 JTS 38, establecimos que el referido análisis tendrá como punto de partida evaluar **"el grado de_independencia que requiere,** con respecto a la Rama Ejecutiva, el funcionario en cuestión para ejecutar eficientemente las tareas que le fueron delegadas" **para entonces poder determinar si el funcionario es "puramente ejecutivo"** y por lo tanto puede ser libremente removido. A esos efectos, véase, además: *Wiener v. United Status*, 357 U.S. 349, 353 (1958)

de Desarrollo Ocupacional es una estrictamente ejecutiva. El Consejo es una entidad gubernamental adscrita a uno de los departamentos del Ejecutivo de rango constitucional como lo es el Departamento del Trabajo. El Director Ejecutivo es el funcionario creado por ley para dirigir las operaciones de esta entidad de la Rama Ejecutiva. Adviértase además, que el Consejo no participa de caracteres legislativos o judiciales; nuevamente, sus funciones son estrictamente ejecutivas.

El Director Ejecutivo, como vimos, es nombrado por el Gobernador con el consejo y consentimiento del Senado y su salario lo determina el propio Gobernador. No es éste un funcionario en el servicio de carrera conforme la Ley de Personal del Servicio Público del Estado Libre Asociado y no goza por lo tanto de la protección que la Ley le reconoce a los empleados de carrera.

Como señalamos inicialmente, el Consejo es el cuerpo rector para "implantar y hacer cumplir" la política pública gubernamental relacionada con la educación técnico-ocupacional y, establecer los objetivos de las agencias gubernamentales para adelantar esa política pública. 18 L.P.R.A. sec. 1585 (a),(b). Ciertamente entonces, el Director Ejecutivo al dirigir las operaciones del Consejo, no tan solo implementa sino también participa en la formulación de la política pública gubernamental en un área sensitiva para el desarrollo económico del país. Es por lo

tanto imperativo que el Gobernador pueda ejercer una supervisión efectiva sobre tal funcionario y así asegurarse que se interpreta y aplica la ley correctamente y acorde a su política pública.

De otra parte, las funciones que desempeña y el control que ejerce el Director Ejecutivo respecto los desembolsos de los fondos federales que recibe el gobierno de Puerto Rico, incide directamente sobre asuntos que conciernen al Gobernador, particularmente respecto su política pública de promoción de empleos y fortalecimiento del desarrollo económico. Como correctamente señaló la Corte de Apelaciones para el Primer Circuito, sobre este mismo aspecto:

> "the control over allocation of substantial federal funds and the power to review the regional board's proposal for work place investment **involve policy making on issues of fundamental concern to the Governor: economic development, job creation and job training.**"

*Santana v. Calderón*, 342 F.3d. pág. 21. (Énfasis nuestro.)

Adviértase además, que entre las funciones del Director Ejecutivo, como indicamos, está la de auditar a las juntas locales o regionales que reciben los fondos WIA para, entre otras cosas, cotejar el cumplimiento con los parámetros de contabilidad y la reglamentación estatal y federal aplicable en la utilización de los fondos públicos desembolsados. Como tal, el Director Ejecutivo es un funcionario esencial para que el Gobernador pueda cumplir

con su obligación constitucional de cumplir y hacer cumplir las leyes.[19]

La Ley Núm. 97 dispone que este cargo se ejerza por el término fijo de cuatro años, y no provee circunstancia alguna mediante la cual este funcionario pueda ser removido por el Gobernador. Ahora bien, concluimos ya que el Director Ejecutivo es un funcionario que desempeña labores estrictamente de la esencia del Poder Ejecutivo y que implementa y en menor grado formula, política pública en áreas de alto interés para el gobierno. Así como también que éste asiste al Gobernador en el descargo de su responsabilidad constitucional de velar por el cumplimiento de las leyes. Habida cuenta de lo anterior, concluimos que el término dispuesto en la ley es uno meramente directivo. Ese término no establece un período de tiempo mandatorio para desempeñar el cargo por lo que **no le confiere a ese funcionario un interés propietario sobre el mismo. Tampoco ese término priva al Gobernador de su prerrogativa de**

---

[19] Sobre este particular se señala en *Santana v. Calderón*, 342 F.3d 18, 29 (1st Cir. 2003), lo siguiente:
> Moreover, the Executive Director's responsibility for the receipt, custody and disbursement of the federal funds pursuant to WIA, and her duty to audit the regional boards for accountability and compliance with federal and Commonwealth regulations, make the position important to the Governor's constitutional obligation to faithfully execute the laws in these areas of central concern.

**remover al funcionario del cargo si así lo entiende necesario y procedente.**[20]

De lo contrario, habría que concluir que el término fijado impediría que el Gobernador pudiera cumplir con su prerrogativa constitucional de velar por el fiel cumplimiento de la ley, así como también de adelantar la política pública gubernamental sobre áreas de la injerencia del Poder Ejecutivo.   Ello sería insostenible.   La Legislatura no puede inmiscuirse en áreas que le han sido reservadas a otras ramas de gobierno y mucho menos eviscerar por completo una prerrogativa de otro de los poderes constitucionales.

Resolvemos entonces que el Director Ejecutivo del Consejo de Desarrollo Ocupacional por ser un funcionario gubernamental que ejerce funciones estrictamente ejecutivas; que participa en la formulación e implementación de la política pública del gobierno de Puerto Rico en áreas de seminal importancia como los son: la educación y adiestramiento técnico-ocupacional de sus

---

[20] En igual sentido, en *Santana v. Calderón*, *ante*, pág. 29, la Corte de Apelaciones de los Estados Unidos para el Primer Circuito indico:

> By contrast, if the statute establishing the Executive Director position is interpreted as guaranteeing a four-year term, the Governor's power to assure that the Executive Director is competently performing her responsibilities is severely impaired.  Hence, on the limited record before us on interlocutory appeal, it appears that the position of Executive Director of the HRODC may fall within the Governor's constitutional power of removal under a Morrison-type analysis.

ciudadanos, la creación de empleos, y el desarrollo y fortalecimiento de la economía; y, que asiste al Gobernador en el descargo de su obligación constitucional de hacer cumplir las leyes, **es de libre remoción del Gobernador**.

A la luz de lo anterior, concluimos que el término de cuatro años dispuesto en el Art. 5 de la Ley Núm.97, para ocupar el cargo de Director Ejecutivo del Consejo de Desarrollo Ocupacional, es meramente directivo por lo cual bajo la cláusula de nombramiento de la Constitución del Estado Libre Asociado de Puerto Rico el Gobernador está facultado para remover a dicho funcionario del cargo cuando lo estime necesario y procedente.

Se dictará sentencia de conformidad.


Anabelle Rodríguez Rodríguez
Juez Asociada.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Janet Santana y otros

    Demandante

       v.

Gobernadora Sila María          CT-2004-2
Calderón y otros

    Demandada


SENTENCIA

San Juan, Puerto Rico, a 17 de junio de 2005

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte integrante de la presente, concluimos que el término de cuatro (4) años dispuesto en el Artículo 5 de la Ley Núm. 97, para ocupar el cargo de Director ejecutivo del Consejo de Desarrollo Ocupacional, es meramente directivo por lo que bajo la cláusula de nombramiento de la Constitución del Estado Libre Asociado de Puerto Rico el Gobernador está facultado para remover a dicho funcionario del cargo cuando lo estime necesario y procedente.

Invocada la Regla de Necesidad, lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Fuster Berlingeri concurre con el resultado sin opinión escrita. El Juez Asociado señor Rivera Pérez disiente con opinión escrita.


Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Janet Santana y otros

      Demandante

       v.

                         CT-2004-2

Gobernadora Sila María Calderón
y otros

      Demandado


Opinión Disidente emitida por el Juez Asociado señor Rivera Pérez.


San Juan, Puerto Rico, a  de 17 de junio de 2005.


La Mayoría concluye que la Directora Ejecutiva del Consejo de Desarrollo Ocupacional y Recursos Humanos, al tener funciones administrativas y operacionales, formula e implementa política pública sobre un área sensitiva para el desarrollo económico del país. Concluye, además, que por tal motivo el término fijo de cuatro (4) años dispuesto en el Artículo 5 de la Ley 97 de 18 de diciembre de 1991, según enmendada por la Ley 166 de 23 de julio de 1998, para ocupar dicho puesto, viola la cláusula de nombramiento de la Constitución de

Puerto Rico. Disentimos de tal curso de acción. Apoyamos nuestro disenso en lo resuelto y pautado por este Tribunal en el caso de <u>Arturo Guzmán Vargas v. Hon. Sila M. Calderón, et als.</u>[21]

I

Este es un asunto que proviene del Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico mediante un recurso de certificación interjurisdiccional presentado el 2 de septiembre de 2004. Dicho foro certificó a este Tribunal la interrogante siguiente: ¿Tenía la Gobernadora de Puerto Rico bajo la Constitución de Puerto Rico la autoridad, el 7 de marzo de 2001, para destituir a la señora Janet Santana del puesto de Directora Ejecutiva del Consejo de Desarrollo Ocupacional y Recursos Humanos?[22]

II

Para el 7 de marzo de 2001, fecha en que ocurrieron los hechos que dan motivo a la certificación del asunto sometido ante nos, el estado de derecho estatutario vigente resulta crucial. Los Artículos 5 y 6 de la Ley Núm. 97 de 18 de diciembre de 1991, según enmendada, leían de la forma siguiente:

---

[21] Resuelto el 23 de marzo de 2005, 2005 T.S.P.R. 33, 2005 J.T.S. 38, _____ D.P.R._____(2005).

[22] El texto original en el idioma inglés de la pregunta certificada lee de la forma siguiente: "Does the Governor of Puerto Rico have the authority under the Constitution of Puerto Rico to remove the Executive Director of the HRODC?".

Artículo 5.- Creación, composición, requisito y término de los miembros del Consejo

Se crea el Consejo de Desarrollo Ocupacional y Recursos Humanos, el cual será el organismo rector y normativo del Sistema. **El Consejo retendrá las funciones de asesoramiento, coordinación, establecimiento de política pública y ente regulador y fiscalizador del sistema de desarrollo ocupacional y de recursos humanos.** Se adscribe dicha entidad al Departamento del Trabajo y Recursos Humanos como componente operacional. El Secretario del Trabajo y Recursos Humanos supervisará evaluará y aprobará los ascensos administrativos, la organización interna, las prioridades programáticas y la coordinación entre el Consejo y los demás componentes operacionales del Departamento del Trabajo y Recursos Humanos. **El Consejo estará compuesto por el Secretario de Educación, el Secretario del Departamento de la Familia, el Secretario del Departamento de Desarrollo Económico y Comercio, el Secretario del Trabajo y Recursos Humanos, quién lo presidirá, tres (3) representantes del sector privado y tres (3) representantes del interés público.** Se dispone que uno de los miembros del Consejo será un joven cuya edad no debe exceder los 29 años de edad y que se haya destacado en el campo tecnológico-ocupacional. Los miembros del sector privado representarán, entre otros, al sector industrial, comercial, bancario, agrícola, de servicios y como parte de sus funciones en el Consejo, junto con los miembros del interés público, velarán porque el Sistema responda adecuadamente a las necesidades de educación y adiestramiento tecnológico-ocupacional de los puertorriqueños. **Los miembros del sector privado y los representantes del sector público serán nombrados por el Gobernador con el consejo y consentimiento del Senado de Puerto Rico. El Gobernador nombrará, con el consejo y consentimiento del Senado, un Director Ejecutivo, por un término de cuatro (4) años y hasta que su sucesor sea nombrado y tome posesión del cargo quién dirigirá los trabajos administrativos y operacionales del Consejo.** El Gobernador fijará el sueldo del Director Ejecutivo. Se devuelven al Departamento de Educación, al Departamento del Trabajo y Recursos Humanos y a la

Administración del Derecho al Trabajo todas las facultades y funciones operacionales que se le hubiesen transferido al Consejo.

El Consejo de Aprendizaje del Departamento del Trabajo y Recursos Humanos continuará en vigor.

No podrá ser miembro del Consejo una persona que pueda tener interés económico directo en instituciones educativas. Los miembros del sector privado y el miembro del interés público serán nombrados por el término de cinco (5) años cada uno y ocuparán sus cargos, hasta la fecha de expiración de sus respectivos nombramientos o hasta que sus sucesores sean nombrados y tomen posesión de su cargo. Los nombramientos iniciales del Consejo se harán por los siguientes términos: uno por tres (3) años, uno por cuatro (4) años y dos (2), incluyendo al Presidente, por cinco (5) años.

Toda vacante que ocurra en el Consejo antes de expirar el término de nombramiento de un miembro será cubierta en la misma forma y manera en que éste fue nombrado y por el término no cumplido del miembro que ocasione la vacante...[23] (Énfasis suplido).

Artículo 6 Consejo – Funciones y facultades

**El Consejo será el organismo rector y normativo del Sistema.** Tendrá las siguientes funciones y facultades, sin que las mismas se entiendan como una limitación.

**(a) Implantar y hacer cumplir la política pública que se establece en esta legislación y aquella otra que en el futuro pueda establecerse con relación a la educación técnico-ocupacional y a los propósitos de este capítulo.**

**(b) Establecer los objetivos específicos que reorientarán al Sistema a corto y largo plazo, de acuerdo a la política pública establecida y**

---

[23] 18 L.P.R.A. sec. 1584. La Ley Núm. 168 de 26 de julio de 2003 enmendó el primer párrafo del Artículo 5 antes citado, eliminando el término fijo de cuatro(4) años de nombramiento del (la) Director(a) Ejecutivo(a) y estableciendo que dicho cargo será uno sin término específico, sujeto a la libre designación y remoción del (la) Gobernador(a).

**los objetivos generales del Sistema dispuestos en este capítulo.**

(c) Evaluar y aprobar el Plan Estratégico Quinquenal preparado por el Presidente del Consejo.

(d) Determinar la orientación general de los programas de educación técnico-ocupacional que ofrezcan las agencias, programas o unidades operacionales que componen el Sistema, independientemente de lo dispuesto por cualquier otra ley tomando en consideración las peculiaridades o particularidades de los programas.

(e) Establecer los niveles de competencias mínimas que deberán poseer los alumnos del Sistema para poder obtener los certificados, diplomas o grados. Estos niveles de competencias deben guardar relación con los perfiles ocupacionales que necesite y requiera el sector privado y público.

(f) Aprobar los programas y ofrecimientos académicos y profesionales de los componentes del Sistema y otorgar los títulos y credenciales de competencia que confiere el Sistema en los programas que hayan sido debidamente aprobados y revisar periódicamente las especialidades o profesiones a ofrecer a cada componente del Sistema, teniendo en cuenta la oferta y la demanda.

(g) Establecer las normas para la consolidación de dos o más programas tecnológicos u ocupacionales del sistema.

(h) Establecer normas sobre convalidación y traslado de estudiantes de un programa del Sistema a otro, y la participación simultánea en más de un programa dentro del Sistema.

(i)Estructurar la organización administrativa del Consejo.

(j) Articular los programas ocupacionales existentes, para lo cual podrá establecer la organización del Sistema, incluyendo la facultad de crear, eliminar, transferir, separar o consolidar cualesquiera de los programas que componen el Sistema y aprobar la creación de nuevos programas, escuelas y colegios para la formación tecnológico-

ocupacional.

(k) Recibir y evaluar integradamente las peticiones presupuestarias de los diferentes componentes del Sistema sometidas por el Presidente y someter al Gobernador a través de la Oficina de Gerencia y Presupuesto la petición presupuestaria del Sistema.

(l) Evaluar y aprobar, sujeto a las limitaciones y procedimientos requeridos por las leyes federales, las peticiones de fondos federales de los diferentes componentes del Sistema.

(m) Evaluar y auditar periódicamente los programas y servicios educativos ofrecidos por el Sistema a los fines de determinar su efectividad en el logro de los objetivos establecidos.

(n) Establecer, en conjunto con el Departamento de Educación, la Universidad de Puerto Rico, el Consejo de Educación Superior, el Consejo General de Educación, los centros educativos privados y las agencias que prestan servicios de apoyo, según corresponda, los mecanismos de colaboración y coordinación para facilitar la formación integral del participante y la posible convalidación y acreditación de cursos y título entre éstos y el Sistema.

(o) Establecer coordinación con las Juntas Examinadoras que regulan algunos oficios, de forma que se pueda armonizar este proceso con los ofrecimientos del sistema.

(p) Coordinar con el sector empresarial con el fin de lograr mayor participación de este sector en el desarrollo de los objetivos propuestos incluyendo la cooperación en materia de investigación y desarrollo; promover acuerdos con las empresas para establecer programas y cursos de educación ocupacional del Sistema dentro de éstas y acreditar la experiencia laboral en términos educativos.

(q) Establecer las condiciones que propulsen el convertir cada taller de trabajo en el país en un centro de adiestramiento ocupacional.

(r)Reestructurar los ofrecimientos curriculares de las escuelas vocacionales a tono con los cambios de demanda y oferta del mundo laboral.

(s) Dotar a los centros de adiestramiento técnico-ocupacionales públicos de planta física adecuada y de equipo y talleres modernos que faciliten el desarrollo de destrezas a tono con las exigencias competitivas de una economía global.

(t) Aprobar los reglamentos necesarios para lograr los propósitos de este capítulo y realizar cualquier otra función o facultad inherente.

(u) Someter informes periódicos al Gobernador y a la Asamblea Legislativa sobre el logro de los objetivos y propósitos de este capítulo.

(v) Llevar a cabo y realizar las funciones requeridas en la Sección 111 de la Ley Federal de Educación Vocacional y Tecnología Aplicada Carl D. Perkins. El Consejo determinará cuáles de estas funciones delegará, de acuerdo [con] las disposiciones de dicha ley federal.

(w) Ser depositario y administrar los fondos que recibe Puerto Rico, conforme a la Ley Federal de Educación Vocacional y Tecnología Aplicada Carl D. Perkins así como supervisar su utilización y hacer los desembolsos con cargo a los mismos en la forma prevista en tal ley y para los fines que en la misma se especifican.[24] (Énfasis suplido).

Las funciones de asesoramiento, coordinación, establecimiento, implantación, de hacer cumplir la política pública, de ente regulador y fiscalizador del sistema de desarrollo ocupacional y de recursos humanos residían, a la fecha de los hechos, en el Consejo de Desarrollo Ocupacional y Recursos Humanos, de ahora en adelante Consejo. El (la)

---

[24] Íd., sec. 1585.

Director(a) Ejecutivo(a) del Consejo era nombrado, a la fecha

de los hechos, por el Gobernador(a) de Puerto Rico, con el

consejo y consentimiento del Senado, por un término fijo de

cuatro (4) años para dirigir **"los trabajos administrativos y**

**operacionales del Consejo".** O sea su trabajo consistía en

administrar las oficinas del Consejo y facilitar y permitirle

la operación de sus funciones, a tenor con el estatuto.

La entonces Gobernadora de Puerto Rico, honorable Sila

María Calderón Serra destituyó el 7 de marzo de 2001,

mediante carta, a la señora Janet Santana de su puesto como

Directora Ejecutiva del Consejo. Dicha carta lee de la

forma siguiente:

Estimada señora Santana:

Usted funge como Directora Ejecutiva del
Consejo de Desarrollo Ocupacional y Recursos
Humanos ("CDORH"). Como tal, participa en la
operación y dirección del desarrollo
ocupacional y de recursos humanos del Estado
Libre Asociado, lo que conlleva, entre otras
cosas, la implantación de programas para
desarrollar la inversión en las fuerzas
trabajadoras de Puerto Rico. Sus funciones
por lo tanto son de naturaleza puramente
ejecutiva.

Según el Artículo 5 de la Ley Núm. 166
de 23 de julio de 1998, CDORH "se adscribe al
Departamento del Trabajo y Recursos Humanos
como componente operacional. El Secretario
del Trabajo supervisará, evaluará y aprobará
los ascensos administrativos, la organización
interna, las prioridades programáticas y la
coordinación entre el Consejo y los demás
componentes operacionales del Departamento
del Trabajo y Recursos Humanos."

El 5 de enero de 2001 el Secretario del
Trabajo, Hon. Víctor Rivera Hernández,
solicitó por escrito que se abstuviese de
tramitar toda transacción fiscal que de forma
alguna comprometiese u obligara los fondos de

CDORH. El Secretario le indicó que dicha prohibición incluía nombramiento o reclutamiento de personal, la compra de materiales o equipo, la otorgación de contratos de toda naturaleza y cualquier otra gestión que de forma alguna implicase erogación de fondos de CDORH, exceptuando el pago de nóminas y obligaciones contractuales contraídos con anterioridad. Además, le apercibió que toda transacción fiscal realizada en contravención a sus directrices sería nula e ineficaz. Esta directriz era de cumplimiento inmediato.

Esta comunicación es cónsona con la política pública instituida en mi Administración de exigir un gobierno limpio y transparente. A tales efectos hemos emitido varias directrices administrativas y órdenes ejecutivas dirigidas a asegurarnos el mejor manejo de los fondos públicos y la mejor administración pública. Entre ellas está la Orden Ejecutiva OE-2001-03. La misma es evidentemente de aplicación al CDORH.

Es de mi conocimiento que usted ha realizado unos actos que denotan incumplimiento e insubordinación a la Orden Ejecutiva OE-2001-03 y a las ordenes y directrices del Secretario del Trabajo, Hon. Víctor Rivera Hernández, como es su deber en Ley. Entre los hallazgos de incumplimiento y de insubordinación se encuentran se encuentran los siguientes: (1) usted realizó 3 nombramientos sin autorización mía, del Secretario de la Gobernación o del Secretario del Trabajo; (2) usted realizó un viaje a California para asuntos oficiales, sin la notificación y aprobación del Secretario del Trabajo; (3) usted anunció al personal del Consejo una reorganización del Plan de Clasificación de puestos de carrera sin el consentimiento del Secretario del Trabajo; (4) usted autorizó cinco ordenes de compras de equipos entre el 22 de enero y el 9 de febrero de 2001; y (5) usted ocasionó la devolución de $1,476,070.81 de fondos federales del Título III, y ésta resultó ser una decisión incorrecta, ya que dichos fondos eran necesarios para los asuntos relacionados de cierre de empresas.

> Por las razones antes expuestas, queda usted destituida de su cargo como Directora Ejecutiva del Consejo de Desarrollo Ocupacional y Recursos Humanos, efectivo al recibo de esta carta.
>
> Atentamente
>
> Sila M. Calderón[25]

En el mes de mayo de 2001, la señora Santana y su esposo presentaron ante el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico una demanda a tenor con la Ley de Derechos Civiles de los Estados Unidos, 42 U.S.C. sec. 1983. En la misma, solicitaron un remedio interdictal y daños compensatorios y punitivos. Se demandó a los entonces Gobernadora de Puerto Rico, Secretario del Trabajo, Director del Consejo y al representante de la Región II del Departamento del Trabajo de los Estados Unidos. En vista de la reclamación pendiente ante el foro de primera instancia federal por violación al derecho constitucional federal a un debido proceso de ley, en su vertiente procesal, y a la luz del planteamiento de la señora Santana, realizado a ese foro, que a ella le asistía y tenía un interés o derecho propietario en la posición de Directora Ejecutiva del Consejo por el término fijo de cuatro(4) años, dispuesto por ley, ese foro tenía que determinar si a la entonces Gobernadora de Puerto Rico le asistía la facultad, bajo la Constitución de Puerto Rico, de destituir a la señora Santana de esa posición. El foro

---

[25] Apéndice 1 del recurso de Certificación, págs. 1-2.

federal nos certificó tal asunto en un momento en que este Tribunal no lo había resuelto. Al presente, tal asunto fue pautado por este Tribunal el 23 de marzo de 2005 en el caso Arturo Guzmán Vargas v. Hon. Sila María Calderón Serra, supra. Veamos.

Sobre el tema del alcance del poder del (la) Gobernador(a) de Puerto Rico de destituir funcionarios públicos de sus puestos, así como del poder de la Asamblea Legislativa de Puerto Rico de imponer restricciones a dicha facultad, expresamos en Arturo Guzmán Vargas v. Hon. Sila María Calderón Serra, supra, que la Asamblea Constituyente de Puerto Rico incorporó a nuestra Constitución criterios similares a los adoptados en la jurisdicción federal, en cuanto al alcance de la Rama Legislativa para intervenir, como sucede en el caso de autos, con los poderes delegados por la Constitución de Puerto Rico a la Rama Ejecutiva. Allí expresamos lo siguiente:

> ...el Art. II., Secs. 1, 2 y 3 de la Constitución de los Estados Unidos de América le confiere a su Presidente el poder de nombrar, con el consejo y consentimiento del Senado, a los embajadores, ministros, cónsules públicos, jueces del Tribunal Supremo y todos aquellos funcionarios de los Estados Unidos cuyos cargos se establezcan por ley, y cuyos nombramientos dicha Constitución no prescriba. Todos éstos tienen la obligación de asistirle en su función principal de hacer cumplir las leyes.[26] Sin embargo, y de forma similar a lo

---

[26] En lo pertinente, el Art. II, sección 1, 2 y 3 de la Constitución de los Estados Unidos de América establece que:

que ocurre en nuestra Constitución, el Art. II de la Constitución de los Estados Unidos de América no establece expresamente la facultad, si alguna, que puede tener el Presidente de la nación para destituir a los funcionarios nombrados por éste. El residenciamiento, la única forma de destitución de funcionarios públicos

---

**Sección 1.**

El poder ejecutivo residirá en el Presidente de los Estados Unidos de América.

**Sección 2.**

Con el consejo y consentimiento del Senado tendrá poder para celebrar tratados, siempre que en ellos concurran las dos terceras partes de los senadores presentes. **Asimismo, con el consejo y consentimiento del Senado, nombrará embajadores, otros ministros y cónsules públicos, los jueces del Tribunal Supremo y todos los demás funcionarios de los Estados Unidos cuyos cargos se establezcan por ley y cuyos nombramientos esta Constitución no prescriba. Pero el Congreso podrá por ley, confiar el nombramiento de aquellos funcionarios subalternos que creyere prudente, al presidente únicamente, a los tribunales de justicia o a los jefes de departamento.**(Énfasis suplido.)

**Sección 3**

El presidente informará periódicamente al Congreso sobre el estado de la Unión y le recomendará aquellas medidas que él estime necesarias y convenientes. Podrá, en ocasiones extraordinarias, convocar a ambas Cámaras o a cualquiera de ellas; y en caso de que las Cámaras no estuvieren de acuerdo con relación a la fecha para recesar, el presidente podrá fijarla según lo juzgue conveniente. El presidente recibirá a los embajadores y demás ministros públicos. **Velará por el fiel cumplimiento de las leyes y extenderá los nombramientos de todos los funcionarios de los Estados Unidos.**(Énfasis suplido.)

dispuesta en la referida Constitución, sólo le es de aplicación al Presidente, al Vicepresidente y a todos los funcionarios civiles de los Estados Unidos.[27] Ha sido pues el Tribunal Supremo de los Estados Unidos quien por la vía jurisprudencial ha atendido esta laguna en ley, siendo el caso de Myers v. United States, 227 U.S. 52 (1926), una de las primeras decisiones en tratar este complejo asunto. Véase, Laurence H. Tribe, *American Constitutional Law*, Ed.Foundation Press, 2000, pág. 703-717.

En Myers v. United States, *supra,* el Tribunal determinó que el Congreso no podía privar al Presidente de los Estados Unidos de su poder para destituir un funcionario de la Rama Ejecutiva.[28] El poder de destitución, resolvió el Tribunal, está inmerso en el poder de nombramiento conferido al Presidente por la Constitución de los Estados Unidos de América. En virtud de ello, éste tenía la facultad exclusiva y absoluta para separar a los funcionarios por él nombrados independientemente de que, como sucede en el caso de autos, la ley que crease el cargo le fijase un término de duración o estableciese las causales para la destitución de dichos funcionarios. Este

---

[27] En lo relativo al proceso de residenciamiento, el Art. II, sec. 4 de la Constitución de los Estados Unidos de América establece que:

> El presidente, el vicepresidente y todos los funcionarios civiles de los Estados Unidos serán destituidos de sus cargos mediante procedimiento de residencia, previa acusación y convictos que fueren de traición, cohecho u otros delitos graves y menos graves.

[28] En este caso el Presidente de los Estados Unidos despidió a un Administrador de Correos antes de habérsele vencido el termino de cuatro (4) años para el cual fue nombrado a dicha posición. La Ley que creaba el cargo establecía que los administradores de correos sólo podían ser removidos por el Presidente de los Estados Unidos con el consejo y consentimiento del Senado. Este último requisito fue declarado inválido.

amplio poder, a juicio del Tribunal, concretizaba la responsabilidad del Presidente de la nación de velar porque todas las leyes fuesen cumplidas; deber, que como mencionamos, le impone el Art. II, Sec. 3, de la Constitución de los Estados Unidos de América.

Aproximadamente una década más tarde, en Humphrey's Executor v. United States, 295 U.S. 602 (1935)[29] se limitó substancialmente la norma establecida en Myers v. United States, *supra*. **En esta ocasión se interpretó que la facultad del Presidente de destituir funcionarios nombrados por éste podía ser restringida cuando se tratase de funcionarios revestidos con facultades cuasi-legislativas y/o cuasi judiciales.** A juicio del Tribunal, este tipo de funcionario requiere cierto grado de independencia, con respecto a la Rama Ejecutiva, para llevar a cabo eficientemente las tareas que le fueron asignadas. En lo pertinente, señaló el tribunal:

> We think it plain under the Constitution that illimitable power of removal is not possessed by the President in respect of officer of the character of those just named. **The authority of Congress, in creative quasi legislative or quasi judicial agencies, to require them to act in discharge of their duties independently of executive control cannot well be doubted; and that authority includes, as an appropriate incident, power to fix the period during which they shall continue, and to forbid their removal except for cause in the meantime.** For it is quite

---

[29] En este caso el Presidente de los Estados Unidos destituyó a un miembro de la "Federal Trade Comission", comisión investida de poderes cuasi-legislativos y cuasi-judiciales, al alegar la necesidad de que la Comisión estuviera integrada por personas de su confianza. En la ley habilitadora de la Comisión, el Congreso había dispuesto que sus miembros serían nombrados a término y que sólo podían ser destituidos por ineficiencia, negligencia o ilegalidades en el manejo de su oficina.

evident that one who holds his office only during the pleasure of another cannot depended upon to maintain an attitude of independence against the latter's will. 295 U.S. a la pág. 629. (Énfasis suplido.)

La doctrina elaborada en Humphrey's Executor v. United States, según discutida anteriormente, fue sostenida, años más tarde, en Wiener v. United States, 357 U.S. 349 (1958). [30] El Tribunal resumió de la siguiente manera lo que constituiría el criterio rector en este tipo de caso:

**Thus, the most reliable factor for drawing an inference regarding the President's power of removal in our case is the nature of the function that Congress vested in the War Claims Comission.** What were the duties that Congress confined to this Comission? And can the inference fairly be drawn from the failure of Congress to provide for removal that these Commissioners were to remain in office at will of the President? Id a la pág. 357 U.S. a las págs. 353-354 (Énfasis suplido.)

El alcance del poder de destitución del Presidente fue considerado nuevamente por el Tribunal Supremo de los Estados Unidos en Morrison v. Olson, 487 U.S. 654 (1988). [31]

---

[30] En este caso el Presidente de los Estados Unidos, en aras de reclutar personal de su absoluta confianza, destituyó a un miembro de la Comisión de Guerra. Dicha comisión fue creada para adjudicar solicitudes de compensación presentada por individuos u organizaciones que hubieran sufrido daños durante la Segunda Guerra Mundial. La ley habilitadora de la Comisión establecía que el término de incumbencia de los comisionados terminaría cuando concluyese su encomienda. Sin embargo, nada se dispuso en cuanto a la destitución de sus miembros.

[31] En este caso se cuestionó la limitación impuesta por un estatuto al poder de destitución del Presidente, otorgándole

Similar a lo resuelto en <u>Humphrey's Executor v. United States,</u> *supra*, y la secuela de casos que le citan, dicho foro señaló que el análisis realizado por los tribunales al momento de decidir si el Presidente tiene facultad para destituir a un funcionario nombrado por éste no puede limitarse al tipo de función que realiza el funcionario, es decir, puramente ejecutivas, cuasi-legislativas o cuasi-judiciales. **<u>Aunque dicho análisis es de por sí esencial al momento de decidir si el Presidente tiene o no la facultad de destituir al funcionario en cuestión, es indispensable, además, evaluar la forma en que las restricciones impuestas al poder de destitución del Presidente inciden en la facultad de éste de cumplir y hacer cumplir las leyes</u>**. Es imprescindible, pues, evaluar el grado de independencia que requiere, con respecto a la Rama Ejecutiva, el funcionario en cuestión para ejecutar eficientemente las tareas que le fueron delegadas. En lo pertinente, dicho foro señaló:

> We undoubtedly did rely on terms "quasi-legislative" and "quasi-judicial" to distinguish the officials involved in *Humphrey's Executor* and *Wiener* from those in *Myers*, but our present considered view is that the determination of whether the Constitution allows Congress to impose a "good-cause" type restriction on the President's power to remove an official cannot be made to turn on whether or not that official is classified as "purely executive". **The analysis contained in our removal cases is designed not to define rigid categories of those officials who may or may not be removed at will by the President, but to ensure that Congress does not interfere with the President's exercise of the "executive power" and his constitutionally appointed duty to "take care that the laws be faithfully executed" under Article II...**

---

dicho poder al Secretario de Justicia Federal.

[. . .]

**[B]ut the real question is whether the removal restrictions are of such a nature that they impede the President's ability to perform his constitutional duty and the functions of the officials in question must be analyzed in that light.** 487 U.S. a las págs. 689-691. (Énfasis suplido)


B.


En virtud de lo anterior, y cónsono con el mandato que nos dieron los miembros de la Asamblea Constituyente en momentos en que se debatía el alcance del poder de remoción del(la) Gobernador(a), de adoptar la interpretación que se le ha dado al asunto en la jurisdicción federal, es forzoso concluir, como punto de partida para nuestro análisis, que cualquier determinación relacionada a la constitucionalidad de una limitación estatutaria al poder de nombramiento y/o destitución del gobernante requiere un análisis caso a caso en el cual es imprescindible identificar si el funcionario realiza funciones de naturaleza "puramente ejecutiva", cuasi-legislativa o cuasi-judicial. Cuando se trate de un funcionario con facultades "puramente ejecutivas", la facultad de la Rama Legislativa para imponer requisitos para destituir a dicho funcionario es mínima debido a que se trata, en la mayoría de los casos, de funcionarios que colaboran directamente en la implantación de la política pública y en la ejecución de aquellas funciones asignadas por la Constitución a la Rama Ejecutiva.

**El criterio principal para determinar la validez del estatuto consiste en que la limitación legislativa al poder de destitución del Gobernador(a) de Puerto Rico no interfiera en forma impermisible e irrazonable con su facultad constitucional de hacer cumplir y poner en vigor las leyes y de formular e implantar la política pública. El examen al estatuto exige que la limitación legislativa a dicha facultad no limite impermisiblemente los poderes de la**

**Rama Ejecutiva ni lesione el balance que debe existir entre las ramas del gobierno.**

Distinto es el caso de aquellos funcionarios que desempeñan tareas cuasi-legislativas y cuasi-judiciales. A este tipo de funcionario la Asamblea Legislativa puede garantizar un grado de independencia mayor, que le permita cumplir con sus funciones, libre de cualquier interferencia de otras ramas de gobierno. Por ende, en ese caso, cualquier restricción razonable al poder de destitución del(la) Gobernador(a) sería válida, claro está, a menos que incida sobre la facultad del gobernante de cumplir con sus poderes constitucionales. [32] (Énfasis suplido).

Tratando el asunto ante nuestra consideración sobre algún tipo de limitación legislativa al poder de destitución del (la) Gobernador(a), es precisamente a la luz de esa normativa jurídica que debemos atender la controversia de autos. El Director(a) Ejecutivo(a) del Consejo de Desarrollo Ocupacional y Recursos Humanos ejerce una función ejecutiva reducida a dirigir **"los trabajos administrativos y operacionales del Consejo" por un término fijo de cuatro(4) años dispuesto por ley.** El criterio principal para determinar la validez de ese estatuto consiste en que tal limitación al poder de destitución del(la) Gobernador(a) de Puerto Rico **no interfiera en forma impermisible e irrazonable con su facultad constitucional de hacer cumplir y poner en vigor las leyes y de formular e implantar la política pública gubernamental sobre el área del desarrollo económico del país.**

---

[32] Arturo Guzmán Vargas v. Hon. Sila María Calderón, et als, *supra*, págs. 14-22.

El (la) Gobernador(a) de Puerto Rico tiene la facultad y a la misma vez el deber y obligación, a tenor con el Artículo IV, Sección 4 de la Constitución de Puerto Rico, *supra*, de **cumplir y poner en vigor las leyes vigentes** y de **hacer cumplir y poner en vigor las mismas** a través de todos aquellos funcionarios que están bajo su poder de **"supervisión e inspección"**. Para el descargo de ese rol de naturaleza constitucional, el (la) Gobernador(a) de Puerto Rico tiene **poder absoluto e irrestricto** sobre ciertos y determinados **"funcionarios ejecutivos"** cuyas funciones son **"puramente ejecutivas" y están directamente vinculadas con el descargo de su rol constitucional**. De no tener facultades plenarias sobre esos funcionarios en el ejercicio de su **"poder de nombramiento y destitución"** no podría formular la política pública de la Rama Ejecutiva, a tenor con el mandato democrático del Pueblo. Tales funcionarios son esencial y fundamentalmente los miembros del Gabinete del (la) Gobernador(a) de Puerto Rico y su cuerpo de asesores y ayudantes. A través de esos funcionarios se formula y se implanta la política pública de la Rama Ejecutiva, y se inicia, cuando es necesario, la aprobación, mediante proyectos de ley de administración, de estatutos ajustados al programa de gobierno del partido político en el poder. Una vez aprobada, y ya vigente esa legislación los miembros del Gabinete fundamentalmente están llamados a **cumplirla y ponerla en vigor** en representación del (la)

Gobernador(a) de Puerto Rico. No obstante, de mantenerse vigentes ciertos y determinados estatutos por no ser derogados o enmendados por la nueva administración de gobierno en el poder, el (la) Gobernador(a) de Puerto Rico tiene la facultad y a la misma vez el deber y obligación de cumplir con ellos y ponerlos en vigor, y de hacerlos cumplir y que se pongan en vigor a través de los funcionarios que están bajo su **"supervisión e inspección"**. Existen funcionarios que aunque están adscritos a la Rama Ejecutiva, y bajo el poder de **"supervisión e inspección"** del (la) Gobernador(a) de Puerto Rico las funciones que ejercitan no son esenciales y fundamentales para que éste(a) último(a) pueda rendir su rol constitucional. Sobre esos funcionarios el **"poder de destitución"** del (la) Gobernador(a) no es absoluto y puede ser restringido y limitado por la Asamblea Legislativa de Puerto Rico, sin menoscabar el poder de **"supervisión e inspección"** de naturaleza constitucional que el (la) Primer(a) Ejecutivo(a) tiene sobre ellos. Existen funcionarios que aunque sus funciones son ejecutivas no son esenciales ni fundamentales para que el (la) Gobernador(a) de Puerto Rico descargue y desempeñe su rol constitucional. A estos funcionarios la Asamblea Legislativa les puede conceder independencia de la Rama Ejecutiva y autonomía para el descargo y desempeño de sus funciones, siempre y cuando se

preserve la facultad de **"supervisión e inspección"** del (la) Gobernador(a) de Puerto Rico sobre ellos.[33]

El análisis que gobierna el presente asunto no está enmarcado en la definición rígida de funcionarios ejecutivos adscritos al poder de **"supervisión e inspección"** del(la) Gobernador(a) de Puerto Rico. Está ubicado en **la evaluación y determinación judicial sobre si el Poder Legislativo ha intervenido en una forma impermisible e irrazonable con el ejercicio del "poder ejecutivo" del(la) Gobernador(a) de Puerto Rico y de su facultad y deber constitucional de nombramiento y destitución para el alcance de su mandato constitucional de hacer cumplir y de que se ponga en vigor la ley, a tenor con el Artículo IV, Sección 4 de la Constitución de Puerto Rico.[34] El asunto central ante nos es si el término fijo de cuatro(4) años dispuesto por ley para que el (la) Director(a) Ejecutivo(a) del Consejo dirija "los trabajos administrativos y operacionales del Consejo" es de tal naturaleza que le impida descargar o desempeñar tal rol constitucional.**

Concluimos, al evaluar la cláusula contenida en el Artículo 5 de la Ley número 97, según enmendada, en conjunto

---

[33] Véase Opinión de Conformidad emitida por el Juez Asociado señor Rivera Pérez a la que se unieron los Jueces Asociados señor Rebollo López y señor Corrada del Río en <u>Arturo Guzmán Vargas v. Hon. Sila María Calderón, et al</u>, *supra,* págs. 85-87.

[34] Artículo IV, sec. 4, Const. E.L.A., L.P.R.A., Tomo I, ed. 1999, pág. 385.

y como un todo con las demás partes de esa ley, vigente al 7 de marzo de 2001, que la limitación allí contenida al poder de destitución del(la) Gobernador(a) de Puerto Rico de (la) Director(a) Ejecutivo(a) del Consejo **no le impedía en forma impermisible e irrazonable ejercitar su "poder ejecutivo" y desempeñar su rol constitucional.** Las funciones del (la) Director(a) Ejecutivo(a) del Consejo de dirigir **"los trabajos administrativos y operacionales del Consejo" no impedían de forma impermisible e irrazonable el desempeño del rol constitucional del(la) Gobernador(a) de Puerto Rico de cumplir y poner en vigor las leyes.** Aunque dicho(a) funcionario(a) está bajo el poder de **"supervisión e inspección"** del(la) Gobernador(a) de Puerto Rico no tenía, a la fecha de los hechos, función protagónica alguna sobre aquellas áreas y facultades adscritas al Consejo de Desarrollo Ocupacional y Recursos Humanos, de formulación e implantación de política pública. La función del(la) Director(a) Ejecutivo(a) del Consejo, al 7 de marzo de 2001, era dirigir el aspecto administrativo de las oficinas del Consejo y facilitar y permitirle a ese cuerpo ejercer sus facultades y funciones, a tenor con el estatuto. No atinamos a entender por qué era imprescindible y necesario para la entonces Gobernadora de Puerto Rico la destitución de la señora Janet Santana, **por impedir en forma impermisible e irrazonable el descargo de su rol constitucional de hacer cumplir y poner en vigor las leyes.** Por el contrario dicho estatuto le permitía asegurarse,

mediante su poder de **"supervisión e inspección"** que el (la) Director(a) Ejecutivo(a) del Consejo cumpliera a cabalidad el mandato legislativo impartido de dirigir **"los trabajos administrativos y operacionales del Consejo"**. Bajo el Artículo 5 de la Ley 97, *supra*, vigente al 7 de marzo de 2001, el(la) Gobernador(a) de Puerto Rico retuvo el poder de nombramiento, y el de remoción, mediando por supuesto en éste último, la garantía constitucional a su debido proceso de ley, que le proveía de una capacidad y habilidad sustancial para asegurarse que las funciones asignadas por estatuto al(la) Director(a) Ejecutivo(a) del Consejo fueron cumplidas y puestas en vigor cabalmente. Bajo dicho estatuto, el (la) Gobernador(a) de Puerto Rico conservaba la autoridad para destituir a el(la) Director(a) Ejecutivo(a) del Consejo, cuando lejos de cumplir con la ley, utilizara su posición para adelantar otros fines y por ende incumpliera sus deberes y obligaciones.

No observamos en este caso un intento de la Asamblea Legislativa de Puerto Rico para aumentar sus poderes a expensas del Poder Ejecutivo. Este caso no presenta una usurpación por el Poder Legislativo de las funciones del Poder Ejecutivo. La Asamblea Legislativa no retuvo para sí el poder de **"supervisión e inspección"** del(la) Director(a) Ejecutivo(a) del Consejo. **Concluimos que el Artículo 5 de la Ley 97, *supra*, no impedía en forma impermisible e irrazonable el ejercicio de los referidos poderes de la Rama**

**Ejecutiva, ni lesionaba el balance que debe existir entre esas dos ramas de gobierno**.

La interrogante ante nos, certificada por el foro judicial federal, requiere una contestación directa en la afirmativa o en la negativa estrictamente sobre el asunto de derecho constitucional local certificado. El asunto sobre si el puesto de Director(a) Ejecutivo(a) del Consejo esta revestido de un interés o derecho propietario sujeto a la garantía constitucional federal a un debido proceso de ley, en su vertiente procesal, es uno eminentemente de la jurisdicción federal y no compete a esta Curia su atención.

La mención por la Mayoría, en su Opinión, de que la señora Janet Santana no era una empleada de carrera, conforme a la "Ley de Personal del Servicio Público de Puerto Rico"[35], por lo que no disfrutaba de la protección que esa ley le reconoce a ese tipo de empleados es una innecesaria e irrelevante al asunto ante nos, certificado por el foro judicial federal. Por lo que diferimos y disentimos, por deferencia a dicho foro de tal curso de acción.

III

Por los fundamentos antes expuestos disentimos de lo actuado y pautado por la Mayoría. Decretaríamos la validez

---

[35] 3 L.P.R.A., sec. 1301 et seq.

constitucional del Artículo 5 de la ley número 97, según enmendada.


EFRAIN E. RIVERA PEREZ
Juez Asociado